## Case No. 14,487.

### UNITED STATES v. BABCOCK.

[3 Dill. 581;[1] 3 Cent. Law J. 143; 1 Cin. Law Bul. 52.]

Circuit Court, E. D. Missouri. 1876.

CONSPIRACY — CIRCUMSTANTIAL EVIDENCE — DECLARATIONS OF CONSPIRATORS—TESTIMONY OF ACCOMPLICES.

1. What is necessary in order to constitute a conspiracy; essential to prove some one of the overt acts as charged. Guilty knowledge and participation necessary, but same may be proved by circumstantial evidence.

[Cited in U. S. v. Howell, 56 Fed. 32; U. S. v. Cassidy, 67 Fed. 702.]

2. Necessity of showing motive, where the evidence is circumstantial.

3. The testimony of Everest and Magill, as to the mailing, at the instance of Joyce, of an envelope to the defendant containing a $500 bill, and the subsequent withdrawing of it from the letter-box, and the returning of it to Joyce, analyzed, and its effect stated.

4. The dispatches, correspondence, and testimony of the president, with regard to the appointemnt of a successor tc Collector Ford, grouped for the convenience of the jury, and the questions arising thereon stated.

5. The dispatches and correspondence which took place at the time of Joyce's trip to Califor-

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

·nia, grouped, and the respective theories of the prosecution and defence with reference thereto stated.

6. The dispatches and testimony relating to the contemplated visit of inspection by Brooks and Hogue to the St. Louis distilleries; and also those in regard to the projected transfer of revenue officers, grouped for the convenience of the jury.

7. After the indictment of McDonald, one of the conspirators, letters were sent to him by the defendant through Major Grimes. Neither the prosecution nor the defendant produced the letters, or proved their contents. *Held,* that the jury were not at liberty to conjecture what their contents were, but were to receive the fact as a circumstance that the defendant and this conspirator were in correspondence with each other about some matter undisclosed, and might consider the time when the correspondence took place, and the manner in which it occurred.

8. The acts and declarations of conspirators are not, of themselves, evidence to connect a third person with the conspiracy; but, if such third person is shown to have been a member of the conspiracy, then telegraphic dispatches of fellow conspirators, among themselves or to others, sent for the purpose of promoting the objects of the conspiracy, become evidence against him.

9. The credit to be given to the testimony of the accomplices stated.

10. Some rules laid down for the guidance of the jury in determining the credibility of witnesses.

11. The effect to be given to evidence of good character of the defendant stated.

12. In cases where the evidence tending to show guilt is wholly circumstantial, the following rules are laid down: 1. The hypothesis of delinquency or guilt of the offence charged in the indictment should flow naturally from the facts proved, and be consistent with them all. 2. The evidence must be such as to exclude every reasonable hypothesis but that of his guilt of the offence imputed to him: or, in other words, the facts proved must all be consistent with and point to his guilt only, but they must be inconsistent with his innocence. People v. Bennett, 49 N. Y. 144. If the evidence can be reconciled either with the theory of innocence or of guilt, the law requires the jury to give the accused the benefit of the doubt, and to adopt the former. The burden of proof does not shift in criminal cases: it is on the prosecution throughout to establish the defendant's guilt by the evidence, and, in criminal cases, the defendant, not being permitted to testify, cannot be called upon to explain or produce any proof, until the prosecution, by the evidence it actually produces, establishes the defendant's guilt beyond a reasonable doubt.

13. The law clothes a person accused of crime with a presumption of innocence, which attends and protects him until it is overcome by testimony which proves his guilt beyond a reasonable doubt — "beyond a reasonable doubt" — which means that the evidence of his guilt, as charged, must be clear, positive and abiding, fully satisfying the minds and consciences of the jury. It is not sufficient, in a criminal case, to justify a verdict of guilty, that there may be strong suspicions, or even strong probabilities, of guilt, nor, as in civil cases, a preponderance of evidence in favor of the truth of the charge against the defendant: but, what the law requires, is proof, by legal and credible evidence, of such a nature that, when it is all considered by the jury, giving to it its natural effect, they feel, when they have weighed and considered it all, a clear, undoubting and entirely satisfactory conviction of the defendant's guilt.

[Cited in brief in State v. Shaeffer, 89 Mo. 274, 1 S. W. 293.]

[This was an indictment against Orville E. Babcock. For former proceedings, see Cases Nos. 14,484, 14,485, 14,486, and 16,594.]

DILLON, Circuit Judge (charging jury). In preparing what I have to say to you, I am happy in having had the assistance of my Brother TREAT, and his concurrence in all the statements and propositions which follow.

Gentlemen, if it is a source of gratification to the court and counsel that their respective labors in this case are drawing to a close, it must be doubly so to you, since, for more than two weeks, you have been restrained of your liberty, deprived of the society of family and friends, cut off from intercourse with the world, and not allowed to converse, even among yourselves, on that subject which has filled the minds of everybody else. The court would willingly have relieved you of this constraint, but the great public interest the case has excited, and the pronounced course of many public journals respecting it—some prejudging it on the one side, and some on the other—and the many imperfect reports of the trial which have met our observation, made it not only proper, but necessary, in the interest of justice, that you should be removed beyond the reach of any popular feeling, however strong or subtle, whether favorable to the government or to the defendant; beyond the influence of the press, one of whose plainest public duties it is to abstain, pending a trial, from a course calculated to interfere with the due administration of justice; in a word, beyond any influence whatever, except that to which the solemn oath you have taken confines you, namely, "the law and the evidence given you in court."

The constitutional guaranty of a trial by jury, upon legal evidence, under the supervision of the court, is designed to protect the innocent and punish the guilty, and this wise provision will be practically subverted if it be not sedulously guarded from all improper influences: and this is especially necessary in cases which, for any reason, are attended with great public interest or feeling.

Gentlemen, it is justly due to the cheerful patience with which you have submitted to this long confinement, not less than to the attentive care you have given, day after day, to the coming in of the vast mass of testimony now before you for your consideration, that we should, before proceeding to give you directions as to the law of the case, thus publicly recognize and commend your course and conduct.

The court has had the benefit of all the suggestions and arguments that could be offered on the one side or the other by the eminent counsel in the case, touching the questions of law arising in it. Thus aided, our duties on the trial were made comparatively easy, and, fortunately, the duty that yet remains to us is plain: for there is no principle of law now belonging to the case which is

controverted by counsel, or which has not been long settled by the courts of Great Britain and this country.

Our further duty is simply to state and define these rules of law, and to make such observations as will assist you in properly applying these rules to the case which the testimony presents for your decision.

The case against the defendant is one which mainly depends upon circumstantial evidence, and it is in such cases that counsel can be of great assistance to the jury in directing their attention to those circumstances which are considered material to their respective theories, and in commenting upon their force and effect. It has been your good fortune, gentlemen, to listen to arguments, both for the government and for the defendant, which have been marked in no common degree with clear statement, great ability, and masterly analysis.

Declaring that you enter the jury-box wholly free from opinion or bias, one way or the other; kept aloof, pending the trial, from any influence that could improperly affect you; aided by the argument of counsel, and by such instructions and advice as the court is able to give, you come to your deliberations with every circumstance which can conduce to the formation of sound conclusions, and the rendition of a true verdict, according to the law and evidence given you on the trial. The two main questions presented for your consideration are:

1. Was there such a conspiracy as is described in the indictment, and was any one of the overt acts committed, as alleged, in furtherance of said conspiracy?

2. If such conspiracy existed, was the defendant a member of it, or one of the conspirators?

As to the first of these questions, you may, perhaps, have very little difficulty. It is not necessary to constitute a conspiracy that two or more persons should meet together, and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, by words or in writing, state what the unlawful scheme was to be, and the details of the plan or means by which the unlawful combination was to be made effective. It is sufficient if two or more persons, in any manner, or through any contrivance, positively or tacitly come to a mutual understanding to accomplish a common and unlawful design. In other words, where an unlawful end is sought to be effected, and two or more persons, actuated by the common purpose of accomplishing that end, work together, in any way, in furtherance of the unlawful scheme, every one of said persons becomes a member of the conspiracy, although the part he was to take therein was a subordinate one, or was to be executed at a remote distance from the other conspirators. A combination formed by two or more persons, to effect an unlawful end, is a conspiracy, said persons acting under a common purpose to accomplish the end designed. Any one who, after a conspiracy is formed, and who knows of its existence, joins therein, becomes as much a party thereto, from that time, as if he had originally conspired.

The charge in the indictment is substantially that a conspiracy was formed to defraud the United States of the tax of seventy cents per proof gallon on distilled spirits to be produced thereafter in the distilleries named in the indictment. It is necessary, in order to prove the conspiracy as charged, to establish also that some one of the overt acts named was committed by the person alleged in the indictment to have been guilty of said overt act, and that he was one of the conspirators, doing the act to promote the unlawful scheme.

Upon the evidence in the case, and the concessions of counsel, you will, probably, have no doubt as to the existence of a conspiracy of enormous proportions, between the distillers on the one hand and certain internal revenue officers on the other, formed and maintained in the city of St. Louis, whereby the government was systematically plundered for a long period of time, of revenue to a vast amount. It was the duty of the government, on discovering this conspiracy, to crush it—to stamp it out of existence—and to bring the guilty to justice and deserved punishment. But the government sustains a relation and owes a duty to its citizens, as well as to its revenues, and its interests do not demand and will not be promoted by the conviction of any one who is not proved, in the manner required by the rules of law, to be guilty of the offence imputed to him; and so, gentlemen, you must come to a dispassionate consideration of this case, recollecting that the court, and the jury, as a part of the court, have but one duty to discharge, but one object to attain, and that is to ascertain the truth, and to do justice with absolute impartiality and fearless independence.

It is well known that the attention of the country has been drawn to these frauds, and the occurrences which have taken place under your observation show the warm public interest in these trials. We feel it to be our duty to say that, while the indignation of every right-minded citizen is justly excited against the real perpetrators of these frauds, the jury should be especially on their guard that this should not overmaster, or in any way, or in the least degree, influence their judgment in deciding the great issue before them, and that is, whether the defendant was and is fully proved to have been a member of the conspiracy. But, in proportion to the extent of the indignation, there may be the danger, if the jury are not sedulously on their guard, of including in the list of the guilty, persons named in connection with these frauds, but whose connection remains to be established in the manner and to the extent required by the law in all criminal cases. It is just as much

the duty of the jury to acquit the innocent as to convict those proved to be guilty.

Assuming that you will find the existence of the conspiracy between Joyce and the distillers and others, your inquiry will be narrowed to a single ultimate question of fact, namely, was the defendant one of the conspirators—a fellow conspirator with Joyce and the distillers named in the indictment? The government affirms it, and must prove it by legal and satisfactory evidence, in order to ask a verdict in its favor. As the defendant is indicted for conspiracy with Joyce and the distillers named in the indictment, it is clear that the charge implies that the defendant knew there was such a conspiracy in the city of St. Louis, and, with such knowledge, knowingly aided the conspirators in their unlawful scheme; and this guilty knowledge and participation must be proved by the government. No witness has been introduced who has testified that the defendant was ever informed or knew of the conspiracy, or that he ever admitted his knowledge of it, or participation in it. No writing signed by the defendant has been produced which, in direct or express terms, shows such guilty knowledge and participation on his part. But the law does not require direct proof of these facts, but they may be proved by facts and circumstances which show them beyond a reasonable doubt. Accordingly, the prosecution relies upon certain facts and circumstances which it claims to have established by evidence, which it furthermore claims not only justifies, but makes clear and positive the conclusion to be drawn therefrom, viz., that the defendant knew of the conspiracy, and knowingly aided the conspirators.

The case of the defendant is peculiar. He was not a distiller or rectifier. He was not in the internal revenue service as an officer or agent. The theory of the government is that he was sought out by Joyce and McDonald, leading conspirators, because of his residence in Washington, where the internal revenue bureau is located, and his supposed facilities to give information which would prevent the detection and discovery of the frauds, and otherwise render services in aid of the conspiracy. This, it is claimed, is their motive, and no motive is ascribed by the counsel for the government as the inducement to the defendant to enter into the conspiracy, except for purpose of pecuniary gain to himself. In all cases, and especially in cases depending on circumstantial evidence, an inquiry into the motives actuating the accused is always important, because human experience shows that men do not commit crime without motive therefor. To show the defendant's motive to be that of pecuniary gain, and to establish his knowledge of, and guilty participation in, the conspiracy, the prosecution relies mainly upon the testimony of Everest as to the mailing of an envelope, by Joyce, with $500

inclosed therein, to the defendant, and upon certain telegraphic messages to and from the defendant, in connection with the cotemporaneous circumstances, and in connection with other dispatches sent to and from other alleged or confessed conspirators.

As different rules of law apply to these different classes of evidence, it is necessary to advert to them separately. You have heard the testimony of Everest and Magill, with respect to the alleged deposit of two letters in a street letter-box, and the removal of the same from the box by Magill at the instance of Joyce. If you believe both Magill and Everest, then the alleged transaction is so far satisfactorily explained as to show that the defendant did not receive the alleged envelope addressed to him. If you discredit the testimony of Magill you should then bear in mind what Everest described as the details of Joyce's manipulation with respect to the $500 bills, and as to the deposit of the same, under the eyes of Joyce, in the letter-box, so as to ascertain satisfactorily to yourselves whether both or either of those bills was placed within the envelopes; also, the fact that Everest is a confessed conspirator, and was, at the time, the collector for the ring, and that, as Bevis testifies, the distillers were then making very little illicit spirits, because they knew their distilleries were being watched. These facts may be important, so far as they show the acts and purposes of Joyce in that transaction, and what he really did and designed to have Everest understand he was doing. As will be hereafter more fully stated, the testimony of accomplices is to be received with extreme caution, and reliance upon it is always held to be dangerous if unsupported. Hence, it is just and proper that the jury should look outside of conspirators' testimony for corroboration. The evidence of Alexander, that Everest obtained two $500 bills, is corroborative of that fact, but not of Everest's testimony as to what was done with them by him and Joyce. Should the jury reach the conclusion, however, that Everest did place in the street letter-box an envelope addressed to the defendant, as alleged, and that said letter contained a $500 bill, and that it was not afterwards removed by Magill, still it is not a conclusive presumption of law, nor a legal presumption, that the defendant actually received it, but it is a fact to be considered by the jury in connection with the routine and usages of the postal service, and with other facts and circumstances, to enable them to determine satisfactorily to themselves whether the defendant did receive that letter and its contents, and whether the same was sent and received for a guilty purpose in connection with, and in furtherance of the conspiracy, and that the defendant knew from whom it came, and that it was sent for such guilty purpose, or in connection with the conspiracy named in the indictment. Under the

circumstances in the case, it becomes one of your most important and delicate duties to determine the credit to be given to the testimony of the accomplice, Everest. He is the only witness who testifies to any fact tending to show the payment of money to the defendant by any of the conspirators. If you credit Magill, the testimony of Everest as to the money becomes unimportant against the defendant, and then important in his favor, as tending to show a design and purpose on the part of Joyce, in promotion of his own schemes, falsely to hold out to the conspirators here that the defendant was a member of the conspiracy; but, if you do not credit the testimony of Magill, then you will have to determine what reliance, if any, taking all the circumstances together, you can safely place on the testimony of Everest, and what it really proves against the defendant, and what inferences of guilt you can safely draw therefrom. These are matters which the law commits to your sound judgment.

Drawing your conclusions on this subject, it will occur to you as obviously just to bear in mind that, according to Everest's evidence, no one but Joyce and himself knew of the transaction; that the defendant's mouth is sealed, so that he cannot testify as to whether he did or did not receive the envelope with the inclosure, so that if the evidence is false, or if the alleged inclosure was never sent or never received by him, he is helpless to prove the negative. These are considerations to be weighed by you in forming a judgment as to whether it has been clearly and satisfactorily established to your minds that the defendant did receive the alleged $500 bill, and for the guilty purpose imputed by the prosecution. As to the credibility of Magill, that is a question wholly for you to determine, guided by the general rule on that subject hereinafter laid down, viz., as to the reasonableness of his statements, his relation to the case, and his manner and conduct on the witness stand, there being no testimony offered to impeach him.

It will thus be understood that on this branch of the case there are four questions for your careful consideration, viz:

1. What credit is due to the testimony of Everest?

2. If he is to be credited, what does his testimony show as to the use made of the $500 bills by Joyce in connection with the envelopes?

3. Whether any such bill was received by the defendant with the guilty knowledge imputed?

4. What credit is to be given to the testimony of Magill?

We now pass to another branch of the testimony.

Evidence has been given tending to show that the conspiracy in St. Louis, between the distillers and rectifiers and internal revenue officers was in full existence and flagrant, when Mr. Ford, collector of internal revenue, died, October 23, 1873.

The first evidence in point of time relied on by the government to connect or tending to connect the defendant with this conspiracy, is that which relates to the appointment of Mr. Ford's successor. It is claimed by the counsel for the government that the defendant, for guilty purposes and to advance the interests of the conspirators, sought to procure the appointment of Joyce or Maguire to that position. On the other hand, the counsel for the defendant claimed that the evidence shows that the defendant did not interfere with or seek to influence the appointment, and that there is nothing to show any improper agency of the defendant, or from which you can infer any unlawful purpose on the part of the defendant in this respect. To sustain this charge against the defendant, the government relies mainly upon the dispatches of Joyce to the defendant, below given, of date respectively October 25, October 27, and October 28, 1873, and particularly the latter, called the "mum" dispatch. On the other hand, the defendant contends that, when these dispatches are read in connection with contemporary dispatches and letters upon the same subject, and the testimony of the president upon the appointment of Mr. Ford's successor, they fail to support the theory of the government as to the agency of the defendant or the unlawful purpose or motive alleged in respect to supplying that vacancy. This, you will perceive, gentlemen, thus becomes a question of fact for you to decide upon the whole testimony in the case relating thereto. The evidence on this point is embraced in the following dispatches and letter of Joyce to the defendant, and the deposition of the president, which we have arranged by days in chronological order, commencing October 25, and ending October 29, 1873. It does not appear in evidence whether the death of Ford was communicated to the president previously to October 25, 1873.

#### Ford-Maguire Dispatches.

"St. Louis, October 25, 1873.—Gen. O. E. Babcock, Executive Mansion, Washington, D. C., Care President Grant: Poor Ford is dead. McDonald is with his body. Let the president act cautiously on the successorship. John A. Joyce."

"St. Louis, Mo., October 25, 1873.—To His Excellency U. S. Grant, Washington: Please see our dispatch of this day to Delano, and tell us how we, as securities of our friend C. W. Ford, can protect ourselves from any wrong action of his deputies. Wm. H. Benton. John M. Krum. Wm. McKee."

This is all that bear date October 25; the next are dated October 27.

"St. Louis, October 27, 1873.—His Excellency U. S. Grant: If you received telegram from us please answer. John M. Krum. Wm. H. Benton. Wm. McKee."

"Washington, October 27, 1873.—John A. Joyce, St. Louis. Mo.: See that Ford's bondsmen recommend you. B." (Babcock.)

"St. Louis, October 27, 1873.—To Gen. O. E. Babcock. Executive Mansion, Washington, D. C., Care President Grant: The bondsmen prefer the man they have recommended. An expression of the president to his friends here will secure everything. Let the president do for the best, depending upon McDonald and myself to stand by his action to the last. Answer. John A. Joyce."

"St. Louis, October 27. 1873.—President U. S. Grant, Washington, D. C.: It would be gratifying to your friends and the Republicans of our city, if Constantine Maguire could be appointed collector of revenue of the district. He is on Mr. Ford's bond, has the confidence of Mr. Ford's friends, and is really an honest, straightforward man, as well as capable. Henry T. Blow."

"St. Louis, October 27, 1873.—To President U. S. Grant. Washington: As your personal and political friends, we urgently request the appointment of Constantine Maguire as successor to our friend, the late C. W. Ford. Wm. H. Benton. Wm. McKee. John M. Krum."

On this subject the president testified as follows: "Q. (Handing witness a copy of telegram). I wish you would state what you know in relation to that? A. This dispatch seems to be dated 'Washington, October 27, 1873.—To Wm. H. Benton, Wm. McKee and John M. Krum: Your request in regard to collectorship will be complied with. (Signed) U. S. Grant' Those gentlemen were part of the bondsmen of Ford, and they had recommended Constantine Maguire for Ford's place as collector. Q. The original of that I believe is in your handwriting? A. Yes, I wrote that myself. I saw the original this morning."

The above are all the dispatches of October 27. On the next day the following:

"St. Louis, October 28, 1873.—To the President: We have the honor to recommend Col. Constantine Maguire for collector of internal revenue, First district Missouri. (Signed) John A. Joyce. C. A. Newcomb. Jno. McDonald. Wm. Patrick."

"St. Louis, October 28, 1873.—Gen. O. E. Babcock, Washington: See dispatch sent to president; we mean it; mum. John A. Joyce."

Letter of Joyce to the defendant:

"St. Louis, October 29, 1873.—Dear General: I heard from you in due course in regard to the collectorship, and went at once to 'see the bondsmen,' but found they were fixed on the man they had recommended, and not being in a position to induce them to act in my behalf, telegraphed as I have already done. Of course the telegrams to parties here revolving in and about the Globe office got out among the particular friends, and therefore the newspaper hawks got just enough of the action already had to spread themselves and tell more than anybody else knew. I am sure if the president acts upon the recommendation of the bondsmen, and what has been sent from the officers, the interest of the government will be secure, and the public generally will be satisfied. Words are not sufficient to convey to yourself and the president the pride I feel for the confidence thus far displayed in me in connection with the vacancy. I shall endeavor in my future actions to meet the good wishes of the president, and you will please convey to him my most hearty thanks for his kindness and confidence. Now that poor Ford is dead and gone I can tell you truly that there are few men on earth that can fill his place. I would like to telegraph and write you more confidentially; but as the interest of the government will be fully protected in your hands, I will say nothing further on the collectorship at present. The resolutions passed at a public meeting in honor of Ford's memory, I have already engrossed on parchment paper, and will forward to his sister and the president in a few days. I am, under all circumstances, your friend, etc., (Signed) John A. Joyce.

"Gen. O. E. Babcock, Washington. D. C.

"P. S. Gen. McDonald sends kindest regards."

### Ford's Successor.

On the subject of the appointment of a successor of Mr. Ford, the president, whose deposition was taken on behalf of the defendant and read in evidence, testifies as follows:

"Q. State, please, what, if any, applications were made at the time of his decease as to the appointment of his successor. A. It is impossible for me to remember all the applications that were made for the place. I do recollect, however, that Gen. Babcock brought me a dispatch addressed to him by John A. Joyce, in which the latter practically applied for the position. Q. What other, if any, applications were made as to the appointment of a successor? But first let me enquire if you have the dispatch to which you have just made reference? A. I do not know. Q. Do you know where it is? A. I do not, but presume it could be found. I think it very likely that it is in possession of Gen. Babcock's counsel or of the district attorney. Q. Were there any requests or communications with regard to the appointment of Mr. Ford's successor from his sureties? A. When Gen. Babcock exhibited to me the dispatches from Mr. Joyce, I said to him that as Mr. Ford died away from home, and very suddenly, I would, in the selection of a successor, be to a great extent guided by the recommendation and wishes of his bondsmen. I thought they were at least entitled to be heard respecting the person to be selected, and upon whom would devolve the settlement of the affairs of the office. Q. What did you do with reference to the appointment, and to whom, if any one, did you decide to leave the nomination of Mr. Ford's successor? A. That information is

embraced in the answer just given. Q. Whom did the bondsmen actually recommend? A. Constantine Maguire. Q. And on their recommendation exclusively he received the appointment? A. I could not say exclusively, because he was well recommended and was satisfactory to the bondsmen of Mr. Ford. Q. Did Gen. Babcock ever, in any way, directly or indirectly, urge, or request, or seek to influence the appointment of Mr. Maguire, or did he ever exchange a word with you upon the subject which indicated that he desired his appointment? A. I do not think he ever did; nor do I believe that he was aware of the existence of Constantine Maguire prior to his recommendation as the successor of Mr. Ford. Q. Did you inform Gen. Babcock that you intended to leave the naming of Mr. Ford's successor to his bondsmen? Did you request him so to notify the parties? A. The question has, I think, already been answered. Q. It embraces perhaps this addition: Did you request him to notify the parties? A. I do not remember."

On his cross examination, the president, in answer to questions by the counsel for the government, testified on the subject as follows:

"Q. Do you remember whether John A. Joyce was recommended to you as Ford's successor, by General Babcock? A. He was not. Q. Was any thing said to you by General Babcock, between the time of the death of Ford and the appointment of Constantine Maguire, touching Joyce's fitness for the place? A. General Babcock presented me a dispatch that he had received from Joyce, saying that he was an applicant, or making application for it; I do not remember the words of it; the substance of it was that he wanted to be Ford's successor; my reply to him was, that I should be guided largely in selecting the successor of Mr. Ford by the recommendation of his bondsmen; he having died suddenly, unexpectedly, and away from home, I thought they were entitled to be at least consulted as to the successor who should settle up his accounts. Q. Did you advise General Babcock to telegraph to Joyce to get the bondsmen of Ford to recommend Joyce for collector? A. I made the statement, in substance, that I have given in answer to a former question; whether I told him to so telegraph or not, it would be impossible for me to say; that might be regarded as at least authority to so telegraph. Q. Did you see any telegram of that character from Babcock to Joyce at that time? A. I do not remember to have seen any. Q. Did Gen. Babcock at that time show you a dispatch from Joyce in these words: 'St. Louis, October 28, 1873.—See dispatch to the president. We mean it. "Mum." (Signed) Joyce'? A. I do not think that my memory goes back to that time; since these prosecutions have commenced I have seen that. Q. I am asking you in regard to that time? A. I do not recall it to memory. Q. Did you receive a protest against the appointment of Constantine Maguire, signed by James G. Yeatman, Robert Campbell, and others? A. I do not remember such a letter. If such a one was received, it is, no doubt, on file in the treasury department. Such a protest may have been received. Q. Your purpose in leaving the nomination of Mr. Ford's successor to his bondsmen was because they were liable on his bond for the administration of his office, was it not? A. Yes, sir. Further than that, some of them were men that I knew very well and had great confidence in."

Unless we have overlooked something, this constitutes all the evidence produced on either side upon the subject of the appointment of Mr. Ford's successor. If we have omitted anything which the counsel on either side think material, they have leave to call it to our attention at this time, or the omission may be supplied by the jury. Upon this testimony two questions of fact concerning it arise for the decision of the jury. 1. Whether the defendant did, in point of fact, seek to influence the appointment of Mr. Ford's successor. 2. If so, whether he did this for the unlawful purpose alleged, that is, knowing that there was in existence such a conspiracy as is charged in the indictment, and thus knowing it, sought to exert such influence to aid and promote the illegal purpose of Joyce or the other conspirators in this city.

### Joyce's Trip to California.

The next class of dispatches relates to the order for Joyce to visit California, and are as follows:

"Washington, March 7, 1874.—John A. Joyce, Revenue Agent, St. Louis, Mo.: I need an agent to make investigations at San Francisco, in place of Sewell, confirmed as supervisor and ordered home. Can you go for me, say for two months? J. W. Douglass, Commissioner."

"St. Louis, March 8, 1874.—Hon. J. W. Douglass, Commissioner Internal Revenue, Washington, D. C.: Shall be pleased to serve the honorable commissioner at San Francisco, or any other place where my work can benefit the government. Before starting to California would like to consult you and receive instructions. John A. Joyce, Revenue Agent."

"Washington, March 9, 1874.—John A. Joyce, Revenue Agent, St. Louis, Mo.: Not necessary to come here. Will write you full instructions care of the supervisor of San Francisco. J. W. Douglass, Commissioner."

On the same day, March 9th, the commissioner telegraphed leave to Hogue to go out of his district to follow up cases of fraud, and a night telegram from Washington, not from the defendant, but over the signature of "Mack," was sent to Joyce, at St. Louis, stating that "if sickness of your family prevents your going West, R. A. Hogue may pay you a visit."

Following that telegram were these, viz.:

"St. Louis, March 10, 1874.—Hon. J. W. Douglass, Commissioner Internal Revenue, Washington, D. C.: When will my instructions to go to California be here? John A. Joyce, Revenue Agent."

"Washington, March 10, 1874.—John A. Joyce, Revenue Agent, St. Louis, Mo.: Full instructions will be mailed to San Francisco. J. W. Douglass, Commissioner."

"Washington, March 11, 1874.—H. Brownlee, Revenue Agent, Newcastle, Ind.: You have permission to follow evidences of fraud out of your district. J. W. Douglass, Commissioner."

"March 11, 1874.—Col. John A. Joyce, Revenue Agent, St. Louis, Mo.: Did you receive Mack's telegram? Your friends will doubtless make you a visit. Wm. O. Avery."

"St. Louis, March 11, 1874.—Col. Wm. O. Avery, Internal Revenue Office, Washington, D. C.: Telegrams received. Start for San Francisco Sunday night. All perfect here. Joyce."

"St. Louis, March 14, 1874.—Gen. O. E. Babcock, Executive Mansion, Washington, D. C.: Start for San Francisco to-morrow night. Make D. call off his scandal-hounds, that only blacken the memory of F. and friends. Business. J."

This was written and sent by Joyce; only one, and that the last of this series, was addressed to the defendant. To it he wrote this answer by mail:

"Washington D C., March 17, 1874.—Dear Joyce: I received your telegram just before you left. I have seen D., and he assures me that no mention has ever been made of Ford's name in the matter of a brewery, and he says there are no charges against any official out there, that it is against a brewery. I do not know your instructions or trip to San Francisco. I think, though, that it is because D. trusts you to do important work. I hope you will have a pleasant trip, and a successful. Nothing new here. All well. Yours truly etc., etc. O. E. Babcock. To Col. J. A. Joyce, Girard Hotel, San Francisco, California."

In this connection the jury should bear in mind that Douglass testifies that the defendant visited the former to enquire if there were any charges in his (the commissioner's) office against Ford, and that the commissioner said there were none; also the relations which Ford bore in his life-time to the president, as especially shown by the latter in his deposition And also Douglass's testimony to the effect that the defendant did not, in any way, seek to prevent investigation into frauds on the revenue, and also the reasons for sending Joyce to California.

The prosecution claims that the purpose of Joyce in appealing to the defendant under pretense of protecting the memory of Ford, was merely to prevent investigations into frauds in St. Louis during his (Joyce's) absence in California, and that the defendant knew of Joyce's guilty purpose, and sought to aid therein.

On the other hand, the counsel for the defendant insist that the testimony distinctly proves that whatever may have been Joyce's purpose, the defendant merely enquired, as Douglass testifies, whether there were any charges against Ford, and denies explicitly that anything was asked as to proposed investigations in St. Louis district. What defendant did on receiving the dispatch from Joyce, depends largely, if not entirely, on the testimony of Douglass, just referred to. It is not here rehearsed in detail, but if the jury are in doubt as to the statements of Douglass on this point, an official copy of his evidence will be furnished to them.

### Joyce's Visit to Washington—Telegrams.

It appears that Joyce proceeded to California pursuant to the orders of the commissioner, and returned by leave in June, 1874, and, at his own request, visited Washington as early as July 1, 1874. While in Washington, the following dispatches passed between him and McDonald:

"Washington, July 1, 1874.—John McDonald, St. Louis: Things look all right here. Let the machine go. Joyce."

"Washington, July 3, 1874.—John McDonald: Matters are hunkey. Go it lively and watch sharply. Joyce."

"Washington, July 17, 1874.—John McDonald, St. Louis: Am here on my return. What can I do for our side? Joyce."

"St. Louis, July 18, 1874.—John A. Joyce, Washington: See Maguire's letter to the commissioner concerning Busby's house, sure. John McDonald."

### The Projected Tour of Brooks and Hogue.

The next group of telegrams is supposed to relate to the projected visit of Brooks and Hogue to St. Louis. Rogers, the deputy commissioner, testifies that the plan to send them to St. Louis was formed in August, 1874. You have heard what was done in respect thereto, the frequent postponements that occurred and the reasons given therefor. In this connection your attention is directed to the following:

"St. Louis, August 5, 1874.—Col. Wm. O. Avery, Treasury Department, Washington, D. C.: Have friends started West again? Find out—let me know. A."

This telegram was in the handwriting of Joyce, and was a night dispatch.

"Cincinnati, O., August 6, 1874.—J. W. Douglass, Commissioner Internal Revenue, Washington, D. C.: I have just received important information showing extensive frauds in St. Louis in 1871 and 1872. If one W. A. Woodward applies for special commission to attend to this matter, it is not necessary. I have the same information he has, and more conclusive. Send Brooks and we can bring all out that is in this matter. Answer. Hogue, Revenue Agent."

From the evidence as to Hogue's conduct from early in 1874 to the close of the alleged conspiracy, the jury may be able to deter-

mine the force and significance of the telegrams just read, as also that from Joyce to Avery, dated August 5, a night dispatch.

"St. Louis, August 26, 1874.—Col. Wm. O. Avery, Chief Clerk, Treasury · Department, Washington D. C.: Are friends coming West? See H. and give me soundings."

This is in Joyce's handwriting. Whether "H." referred to Hogue or some other person is not directly shown in evidence.

This was also a night dispatch:

"Washington, October 17, 1874.—John A. Joyce, St. Louis, Mo.: Your friend is in New York and may come to see you. Avery."

According to Brooks's testimony, he (Brooks) had been in Washington with reference to the projected visit to St. Louis, and was in New York under orders of the commissioner on October 17, 1874.

"St. Louis, October 18. 1874.—Col. Wm. O. Avery, Treasury Department, Washington, D. C.: Give me something positive on movements of friend; act surely, prompt. A."

This was a night dispatch from Joyce:

"St. Louis, October 25, 1874.—Gen. O. E. Babcock, Executive Mansion, Washington, D. C.: Have you talked with D.? Are things right? How? J."

This was a night dispatch from Joyce, and was not answered, nor does it appear so far as we can see, from Mr. Douglass's testimony, that it was ever acted on. If our memory is at fault in this respect, you will correct the omission.

Pursuant to telegraphic orders from Washington, Hogue was to be in St. Louis November 13. From the testimony it seems that he arrived here on November 12, and remained to the 19th. but did not put his name on the hotel register until the 19th—the day he left.

On November 23, Hogue was ordered to report at Washington in person at once, the telegraphic order having been directed to Xenia. O.. On November 26, he telegraphed that he had been detained by sickness in his family, and would report on the 1st of December following. He reached Washington on December 3. and Brooks was summoned on that day to Washington to meet Hogue.

Joyce sent a night dispatch as follows:

"St. Louis. December 3. 1874.—Gen. O. E. Babcock. Executive Mansion. Washington, D. C.: Has secretary or commissioner ordered anybody here? J."

This was not answered.

As Brooks could not go to Washington on December 3. Hogue went to Philadelphia to meet him. and on December 7 both went to Washington. where Brooks remained until noon of December 8. On November 24, Brooks had written this letter:

"United States Secret Service. 56 Bleeker Street, New York. November 21. 1874.—To H. C' Rogers. Deputy Commissioner. Washington, D C —My Dear Sir: I am summoned in the United States court at Philadelphia, on Monday. the 23d. The cases will probably be disposed of on that day, so that I can be

at Washington on Tuesday. If possible, please have Mr. Hogue there by that time, and may I ask that any western case you think we can work, shall be put in such a state as we can take charge of it, and so make the trip profitable to the department, and satisfactory to ourselves. Very respectfully, Jas. J. Brooks, Special Agent."

On December 7, the same day that Brooks and Hogue arrived at Washington from Philadelphia, McDonald also arrived there. On the 8th he informed Rogers that he knew revenue agents had been ordered to St. Louis, and protested against such action.

Whilst then in Washington, he sent the following telegrams:

"Washington, D. C., December 7, 1874.— Col. John A. Joyce, Planter's House, St. Louis, Mo.: Had long ride with the president this afternoon. B. and H. are here, you will hear from me to-morrow. John."

"Corridor House of Representatives, December 8, 1874.—John A. Joyce, Planter's House, St. Louis, Mo.: Dead dog; goose hangs altitudelum; the sun shines. John."

"December 9, 1874.—Col. John A. Joyce, Planter's House, St. Louis. Mo.: I leave tonight for New York—stop at Windsor House; will telegraph you from there. John."

On or about December 10, 1874, the defendant had an interview with Commissioner Douglass, and showed to him a copy of Brooks's letter to Rogers, dated November 21, 1874, the original of which Rogers said had been taken surreptitiously from his desk by some one unknown to him. It is admitted that the defendant did not abstract that letter from Rogers's office; he urged on Douglass that the phraseology of the letter indicated blackmailing purposes, and suggested the employment of a superior class of persons for the intended work; the conversation on that subject as detailed by Mr. Douglass, must be fresh in your memory.

The president in his deposition, states, concerning that matter, as follows:

"Q. Did Gen. Babcock, so far as you know, ever seek in any way to influence your action with reference to any charges made, or proposed to be made against Joyce or McDonald? A. I do not remember of his ever speaking to me upon the subject; he took no lively interest in the matter, or I should have recollected it. Q. Did Gen. Babcock, so far as you know, ever seek in any way to influence your action in reference to any investigation of the alleged whisky frauds in St. Louis or elsewhere? A. He did not. I will state at this point, that I do not remember but one instance where he talked with me on the subject of these investigations, excepting since his indictment. It was then simply to say to me that he had asked Mr. Douglass why it was his department treated all their officers as though they were dishonest persons, who required to be watched by spies. and why he could not make inspections similar to those which prevailed in the army,

selecting for the purpose men of character who could enter distilleries, examine the books and make reports which could be relied upon as correct. Gen. Babcock simply told me that he had said as much to Mr. Douglass. Q. Do you remember the circumstance of John McDonald being in the city of Washington on the 7th day of February, 1874? A. I do not remember the particular date; I remember the time in question. Q. Did you ride with him (McDonald) on or about that date or occasion, and was anything whatever said by him to you with reference to the investigation of alleged frauds in that district? A. I picked him up on the sidewalk as I was taking a drive, and invited him to go with me; I have no recollection of any word or words on any matter touching his official position or business. Q. If I understood correctly the answer, Gen. Babcock's conception was, that in making this investigation it would be wiser to have it done by men of superior character than by men of inferior and suspicious character? A. Yes, sir. Q. Did Gen. Babcock, at or about that time, say anything to you with reference to such investigations, and, to your knowledge, did he in any way undertake to prevent them? A. I have no recollection of his saying anything about that. Certainly he did not intercede with me to prevent them."

On the cross-examination the president said: "Q. Do you remember that Gen. Babcock, prior to May, 1875, talked with you about the propriety of sending detectives into the several districts to detect frauds? A. I do. I remember of his telling me at one time of what he had proposed to Mr. Douglass, but the date of it I do not remember. And that was not a suggestion to me; it was merely telling me what he had suggested to Mr. Douglass, and this is the same that I have before stated. Q. Did you have any conversation with Gen. Babcock prior to May, 1875, in reference to a letter written by J. J. Brooks to deputy commissioner Rogers? A. I do not remember dates, but I remember of his showing me a letter that had been handed to him from somebody in Philadelphia to Mr. Rogers, and he said that that appeared to his judgment to be simply blackmailing; and I think that was the occasion when he told me what he had said to Mr. Douglass, that is, as I remember now. Q. Do you remember when that conversation was? A. No, I do not. My recollection is that he had shown that letter to Mr. Douglass before he did to me, and that was the occasion when he told me of his suggestion."

On December 13, 1874, the defendant and Douglass had a conversation in Washington, while walking, in the course of which Douglass informed the defendant, that the proposed visit of Brooks and Hogue to St. Louis was "off." The following night dispatch was sent by the defendant:

"Washington. D. C., December 13, 1874.— Gen. John A. McDonald. St. Louis, Mo.: I

succeeded. They will not go. I will write you. Sylph." ·

We have thus endeavored to recall the more important portions of the testimony with reference to this branch of the case; your memory will supply the minor details.

The theories, both of the government and of the defendant with respect thereto, have been so fully and elaborately discussed as to require no special comment from the court in this immediate connection.

### Transfer of Revenue Officials. As to the Order Transferring Supervisors and the Suspension of that Order.

Passing to another part of the case, it appears from the testimony of Douglass, Tutton, and the president, that an order was issued about January 27, 1875, transferring supervisors and revenue agents from one district to another, in the supposed interests of the revenue service, and for the detection and prevention of frauds. Mr. Douglass and Mr. Rogers have stated the conversation defendant had with them respectively on the subject, and concerning the impolicy of the order and the reasons assigned to them in support of his views. The prosecution claims that he actively interfered to cause the suspension of that order for the guilty purpose of aiding the conspiracy in St. Louis.

Mr. Douglass testifies that letters for the various transfers were mailed January 27, 1875.

On February 3, the following telegrams were sent and received:

"St. Louis, Mo., February 3, 1875.—Hon. J. W. Douglass, Internal Revenue Office, Washington, D. C.: Don't like the order. It will damage the government and injure the administration. Will explain when I see you. John McDonald."

"Washington, D. C., February 3, 1875.— John McDonald, Supervisor, St. Louis, Mo.: The order of transfer is general and only temporary. J. W. Douglass, Commissioner."

"St. Louis, February 3, 1874.—Gen. O. E. Babcock, Executive Mansion, Washington, D. C.: We have official information that the enemy weakens. Push things. Sylph."

This was written by Joyce, and was a night dispatch and unanswered.

"Washington, February 4, 1875.—Gen. John McDonald, Supervisor, St. Louis, Mo.: The order transferring you to Philadelphia is suspended until further orders. J. W. Douglass, Commissioner."

"Washington, February 5, 1875.—John A. Joyce, Revenue Agent, St. Louis, Mo.: The order directing you to report to Supervisor McDonald, at Philadelphia, on the 15th, is suspended. J. W. Douglass, Commissioner."

Joyce seems to have been in Washington at that time and several telegrams subsequently passed between him and McDonald, as follows:

"St. Louis, February 5, 1875.—To Col. John A. Joyce, Ebbitt House, Washington: Order

to transfer to Philadelphia is suspended. John McDonald, Supervisor of Internal Revenue."

"Washington, February 6, 1875.—To Gen. John McDonald, Planter's House, St. Louis, Mo.: Order busted forever. D. & Co. mad. Hold things level. Kearney."

(This was written by Joyce.)

"Washington, February 10, 1875.—Gen. John McDonald, Supervisor of Internal Revenue, St. Louis, Mo.: Start home to-night. Things look lovely. Watch and wait. John."

It is admitted that this was also written by Joyce. These dispatches indicate that Joyce left St. Louis for Washington on the 4th of February, and did not leave Washington for St. Louis before the 10th:

"Washington, D. C., March 1, 1875.—General John McDonald, Supervisor of Internal Revenue, St. Louis, Mo.: Letter received; have seen the gentleman, and he seems friendly; is looking after improvements of the river. O. E. Babcock."

You have heard from Commissioner Douglass, Revenue Agent Tutton, and the president, their respective statements concerning the suspension of the order for the transfer of supervisors and revenue agents. Mr. Tutton stated his interview, first with the commissioner and next with the secretary of the treasury, to whom he presented his reasons for advising a suspension of that order. He stated, as the result of his conversation with the secretary, that the latter acquiesced in the propriety of his suggestions, and requested him to call on the president and present the subject to him. He testified that he did as thus requested, and gave at considerable length what he said to the president in favor of suspending the order. He stated that his interviews with the secretary and president were on February 3d, and within about two hours of each other; and, before leaving the president, the latter announced that he should at once cause the order to be suspended. The following is the order:

"Executive Mansion, Washington, February 4, 1875.—Sir: The president directs me to say that he desires that the circular order transferring supervisors of internal revenue be suspended by telegraph until further orders. (Signed) Levi P. Luckey."

The following is what the president testifies to on that point:

"Q. Do you recollect the circumstances attending the promulgation of an order transferring the various supervisors from their own to other districts. A. I do. Q. State fully with whom the idea upon which that order was based originated, and the particular reasons which induced you to direct it to be so? A. Some time when Mr. Richardson was secretary, I think, at all events, before Secretary Bristow became the head of the department, Mr. Douglass, in talking with me, expressed the idea that it would be a good plan occasionally to shift the various supervisors from one district to another.

I expressed myself favorably toward it, but it was not done then; nor was it thought of any more by me until it became evident that the treasury was being defrauded of a portion of the revenue that it should receive from the distillation of spirits in the West. Secretary Bristow at that time called on me, and made a general statement of his suspicions, when I suggested to him this idea. On that suggestion, the order making these transfers of supervisors was made. At that time I did not understand that there was any suspicion at all of the officials, but that each official had his own way of transacting his business. These distillers, having so much pecuniary interest in deceiving the officials, learn their ways and know how to avoid them. My idea was, that, by putting new supervisors, acquainted with their duties, over them, they would run across and detect their crooked ways. This was the view I had, and explains the reason why I suggested the change. Q. Can you state whether Mr. Douglass, at that time commissioner of internal revenue, was aware of the fact that you suggested or made the order? A. I do not know that he knew anything about it. Q. After the order had been finally issued, were any efforts made to induce you to order its revocation or suspension? A. Yes, sir; most strenuous efforts. Q. Were such efforts made by prominent public men? A. They were. Q. Did you resist the pressure which was made upon you for revocation or suspension of the order; and if you finally decided to direct the revocation of the order, will you please state why you were induced to do so, and by whom? A. I resisted all efforts to have the order revoked, until I became convinced that it should be revoked or suspended in the interests of detecting frauds that had already been committed. In the conversation with Supervisor Tutton, he said to me that if the object of that order was to detect frauds that had already been committed, he thought it would not be accomplished. He remarked that this order was to go into effect on the fifteenth of February. This conversation occurred late in January, and he alleged that it would give the distillers who had been defrauding the treasury three weeks notice to get their houses in order, and be prepared to receive the new supervisor. That he himself would probably go into a district where frauds had been committed, and would find everything in good order, and he would be compelled so to report. That the order would probably result in stopping the frauds, at least for a time, but would not lead to the detection of those that had already been committed. He said that if the order was revoked, it would be regarded as a triumph for those who had been defrauding the treasury. It would throw them off their guard, and we could send special agents of the treasury to the suspected distilleries—send good men, such an one as he mentioned, Mr.

Brooks. They could go out and would not be known to the distillers, and, before they could be aware of it, the latter's frauds could be detected. The proofs would be all complete, the distilleries could be seized and their owners prosecuted. I was so convinced that his argument was sound, and that it was in the interest of the detection and punishment of fraud that this order should be suspended, that I then told him that I would suspend it immediately, and I did so without any further consultation with any one. My recollection is, that I wrote the direction for the suspension of the order on a card, in pencil, certainly before leaving my office that afternoon, and that order was issued and sent to the treasury, signed by one of my secretaries. Q. Did General Babcock ever, in any way, directly or indirectly, seek to influence your action in reference to that order? A. I do not remember his ever speaking to me about it or exhibiting any interest in the matter. Q. From anything he ever said or did, do you know whether he desired that the order should be revoked or suspended? A. That question, I think, has been fully answered. Q. You have said that you resisted the pressure brought to bear upon you, by prominent men, in regard to the suspension or revocation of the order transferring supervisors. If you have no objection, will you please state the names of those prominent men who brought that pressure to bear against you? A. There were many persons, and I think I could give the names of several senators, and probably other members of congress; but probably I should have to refer to papers that are on file; I do not know that it is material; I know that the pressure was continual from the supervisors and their friends. Q. Can you, from memory, name any senator or representative? A. I could name two or three, but I do not believe it is necessary."

Correspondence with Major Grimes, etc.

The prosecution has also offered the testimony of Major Grimes to show that the defendant sent under cover to him (Major Grimes) three letters to McDonald, after the latter had been indicted. Neither the prosecution nor the defence has produced these letters or shown their contents.

The jury, in cases of this kind, are not at liberty, under the rules prescribed by law, to conjecture what their contents were, but are to receive that fact as a circumstance indicating that the parties thereto were in correspondence with each other on some subject undisclosed, and to consider the time when said correspondence took place and the manner in which it occurred.

The defendant has produced several letters from Joyce to himself, for the purpose of explaining the nature of their correspondence with each other. He has also shown, by the testimony of the president and of many other witnesses, that the duties of his office made him a kind of intermediary between the president and those having business with the latter or the several departments at Washington. These facts it is for you to consider in reaching a conclusion. They may serve to explain what otherwise might appear obscure, and hence are important in any aspect which you may view the evidence in regard to the respective theories advanced.

Declarations and Dispatches—Legal Rules.

Various classes of dispatches, as you will have perceived, have been laid before you—some to the defendant and some from him; some between confessed conspirators, not referring to the defendant, and unaccompanied by proof that he knew of them; and other dispatches between revenue officers and agents of the government. The dispatches between other persons than the defendant are no evidence to show his connection with the conspiracy, unless they are brought home to him. They were admitted to show the nature and purpose, the plan and operations of the conspiracy.

Guilt cannot be fastened upon any person by the declarations or statements, oral or written, of others. Guilt must originate within a man's own heart, and it must be established by his own acts, conduct or admissions. Hence, in determining the question of the defendant's guilt, so far as it is sought to be shown by the dispatches, primary reference must be had to the dispatches to and from the defendant, and more especially such dispatches as he is shown to have answered or acted on. If the dispatches to and from the defendant, in connection with the other facts and circumstances in the case, show that he knew of the alleged conspiracy, and that he was a guilty participator therein, then the dispatches of his fellow conspirators among themselves, or to others, sent for the purpose of promoting the conspiracy, become evidence against the defendant, but not otherwise. What weight, if any, is to be given to the dispatches which are not shown to have been acted upon by the defendant, must depend, among other considerations, upon whether an answer was called for or not, and upon his associations with the persons sending the same; what they import on their face, and whether he knew that the senders were engaged in the conspiracy alleged in the indictment. For it must be understood that, under the established rules of the law, the various acts and declarations of persons, other than the defendant, are not evidence to show that he was one of the conspirators—for no man's connection with a conspiracy can be legally established by what others did in his absence and without his knowledge and concurrence.

You will also remember, gentlemen of the jury, that confessed conspirators in St. Louis testified that they were frequently warned of proposed visits of agents of the revenue service to investigate frauds in this district.

Hence, one of the essential inquiries in this case is as to the sources of the information thus given.

According to the testimony of Brooks, he and Hogue, after a visit to New Orleans, arrived in this city on May 4, 1874, to make an investigation concerning the destruction of books at the establishment of Bevis & Fraser. There had been, in January preceding, an unsatisfactory report on that subject by the local officers here, in respect to which it is alleged that Joyce had visited Washington with fraudulent purposes, indicated by his dispatches, at the time, to McDonald, asking the latter to send his report. The result of the investigation by Brooks and Hogue, when they were here, was the institution of judicial proceedings which culminated in the payment of $40,000, by Bevis & Fraser, to the government, by way of compromise. Mr. Brooks testified that, while here, he cautioned Hogue against his familiar association with persons in this city, who, though not then considered connected with frauds, are now known to have been actively engaged in them.

The letters of Hogue to Bingham show that, early in 1874, if not previously, he (Hogue) had been corrupted, and was working persistently in aid of the conspirators by conveying the information essential to the success of their fraudulent schemes. Bingham had distilleries in Indiana and one here, and information given him by Hogue was sent to Barton, Bingham's superintendent in St. Louis, and by that superintendent promptly communicated to the other conspirators in this city. It appears that Hogue was in St. Louis from the 12th to the 19th of November of that year, his name being omitted from the hotel register until the day he left. About that time, the conspirators here paid him, as a bribe, the sum of $10,000, and his letters indicate that he worked for a long period, and, down to the seizure in St. Louis, in the interests of the conspirators.

The telegraphic dispatches to and from Avery, who was, part of the time, chief clerk in the treasury department, and, part of the time, chief clerk in the internal revenue bureau of Washington, are also before you, and also the frequent visits of McDonald and Joyce to that city, at times when arrivals at St. Louis of revenue agents were apprehended.

These significant facts it is for you to weigh, in order to determine whence the needed warnings to the conspirators came. The prosecution contends that the defendant gave from Washington the information needed by the conspirators here, and aided in preventing the visits here which the conspirators were anxious to avoid. The defendant contends, on the other hand, that Hogue furnished the needed warnings, and, perhaps, Avery also; that the defendant did not know of the existence of the conspiracy, and gave knowingly no aid thereto; that, as the conspirators had full sources of information through Avery and Hogue, they had no adequate motive in seeking his assistance as a member of the conspiracy, or in permitting him to know of their fraudulent schemes.

That Brashear and Hogue, two of the revenue agents sent here, were bribed by the conspirators remains uncontradicted. The facilities which Hogue enjoyed for learning the plans of the revenue authorities at Washington for the detection of frauds in the West, Rogers, Brooks, and Douglass show, and how he used these facilities for the benefit of the conspirators, his letters indicate. In the light of such testimony the jury should examine the alleged connection of the defendant with the conspiracy here, and weigh his acts, conduct, and declarations, oral and written. It is not so much from isolated facts and circumstances, as from all of them taken together, and duly weighed, that a right conclusion can be reached. It may often happen that one or many acts, or groups of acts, taken separately, will fail to establish the existence or nature of a general plan, when all of them, considered together in a careful and painstaking way, will show that there was a general and common plan, and disclose the nature and scope thereof.

We have thus endeavored to recall to your recollection the more prominent features of the evidence, not that any part thereof is to be excluded from your attentive and careful consideration, but, trusting that these references will bring to your memory the minor and other facts and circumstances, which may shed light on the case.

### Testimony of Accomplices.

Some of the witnesses on the part of the government, on material and disputed points, are confessed members of the conspiracy, and under indictment therefor. Such a connection with the offence makes them accomplices, and it thus becomes necessary that the court should state to the jury the law touching the testimony of such witnesses. The rule of law is that accomplices are competent witnesses. That means that the parties have a right to have them sworn. It also implies that, when sworn, you shall consider their testimony. They are competent witnesses, and, under the legislation of congress, they may be compelled to testify. The testimony of conspirators is always to be received with extreme caution, and weighed and scrutinized with great care by the jury, who should not rely upon it unsupported, unless it produces in their minds the fullest and most positive conviction of its truth. It is just and proper, in such cases, for the jury to seek for corroborating facts in material respects. It is just and proper to do it. It is not absolutely necessary, provided the testimony of the accomplice produces in the minds of the jury, full and undoubting conviction of its truth.

## Credibility of Witnesses.

To the jury exclusively belongs the duty of weighing the evidence, and determining the credibility of witnesses. With that the court has absolutely nothing to do. The degree of credit due to a witness should be determined by his character and conduct; by his manner upon the stand; his relation to the controversy and to the parties; his hopes and fears; his bias or impartiality; the reasonableness, or otherwise, of the statements he makes; the strength or weakness of his recollection, viewed in the light of all the other testimony, facts and circumstances in the case. If any of the witnesses are shown knowingly to have testified falsely on this trial, touching matters here involved, the jury are at liberty to reject the whole of their testimony on the trial of this case.

## Character of the Defendant.

The defendant has produced an impressive array of witnesses of the highest character who have testified to his previous uniform and general good reputation, as a man of unquestioned integrity. This is competent evidence, and the good character of the defendant in this respect is a fact to be weighed and considered by the jury, in the light of which they should view all the evidence and determine the question of his innocence or guilt of the crime charged against him in the indictment.

The above is the settled rule of the law in all criminal cases, as well in those in which direct and positive evidence is relied on, as those in which the proof is circumstantial. But in cases of the latter kind the evidence of previous good character has more scope and force than in cases where the proof of the offence is positive and direct. In the language of an eminent judge, speaking upon this point: "There may be cases so made out that no character can make them doubtful; but there may be others in which evidence given against a person without character would amount to conviction, in which a high character would produce a reasonable doubt, nay, in which character will actually outweigh evidence which might otherwise appear conclusive." So that we repeat, the evidence on the subject of character is a fact fit and proper, like all the other facts in the case, to be weighed and estimated by the jury, who, when forming their conclusions upon the various facts and circumstances relied on against the defendant, will inquire and determine whether a person whose character is such as the defendant's has been stated to be by the witnesses testifying on that subject has or has not committed the particular crime for which he is called upon to answer. Whart. Cr. Law (7th Ed.) §§ 643, 644.

## Circumstantial Evidence.

In cases depending upon circumstantial evidence, certain rules of law have long been settled, which it is essential that you should understand and apply. We adopt as a correct exposition of the law on this subject, the opinion of the court of appeals of New York:

"1. The hypothesis of delinquency or guilt (of the offense charged in the indictment) should flow naturally from the facts proved, and be consistent with them all.

"2. The evidence must be such as to exclude every (reasonable) hypothesis but that of his guilt of the offense imputed to him; or, in other words, the facts proved must all be consistent with and point to his guilt not only, but they must be inconsistent with his innocence." People v. Bennett, 49 N. Y. 144.

If the evidence can be reconciled either with the theory of innocence or of guilt, the law requires the jury to give the accused the benefit of the doubt, and to adopt the former. The burden of proof does not shift in criminal cases; it is on the prosecution throughout to establish the defendant's guilt by the evidence, and in criminal cases the defendant, not being permitted to testify, can not be called upon to explain or produce any proof until the prosecution, by the evidence it actually produces, establishes the defendant's guilt beyond a reasonable doubt. Chaffee v. U. S., 18 Wall. [85 U. S.] 516.

## Degree of Proof.

The defendant, by the policy of our law, can neither be compelled nor permitted to testify.

As a substitute for this deprivation, the law clothes the defendant with a presumption of innocence, which attends and protects him until it is overcome by testimony which proves his guilt beyond a reasonable doubt— "beyond a reasonable doubt"—which means that the evidence of his guilt, as charged, must be clear, positive, and abiding, fully satisfying the minds and consciences of the jury. It is not sufficient, in a criminal case, to justify a verdict of guilty, that there may be strong suspicions, or even strong probabilities of guilt, nor, as in civil cases, a preponderance of evidence in favor of the truth of the charge against the defendant; but what the law requires is proof, by legal and credible evidence, of such a nature that when it is all considered by the jury, giving to it its natural effect, they feel, when they have weighed and considered it all, a clear, undoubting and entirely satisfactory conviction of the defendant's guilt. This, and this only, is required. But this much is required. If thus proved, the jury should convict; if not, they should acquit.

## Conclusion.

We trust, gentlemen, that it is unnecessary to remind you that neither partisan feelings nor outside views should have the slightest influence upon your minds as jurors. In every free government it is not

only the right, but the duty, of each citizen to form and express, on all suitable occasions, his convictions and opinions as to the governmental policies and party organizations. It is natural and proper for him to join such a party as most nearly accords with his views. But such views and party associations should remain entirely outside of the jury box. No popular or partisan clamors, no extraneous wishes or considerations, no thoughts other than those which pertain to strictly impartial justice, can be permitted to invade the sanctity of the jury-room, to bias or warp, or even shade its deliberations, without destruction of the safeguard to life, liberty and property furnished through trials by jury. It has been often and forcibly said, that so long as trials by jury retain their full force, impartiality and purity, the liberty, and rights of the citizens, are alike safe against despotism and anarchy. If popular clamor usurp the judgment seat, the era of Marats and Robespierres will return, and frenzied faction sweep away all justice and right. So will justice be gradually undermined if outside influences are suffered insidiously to enter within that threshold where naught should be known save the sworn evidence in the case, and the rules of law as pronounced by the court—rules which the experience and wisdom of ages have demonstrated to be essential to the ascertainment of truth and the due administration of justice.

It will be a sad and shameful day for this country when courts and juries having lost their independence, shall sit simply to register the edict of popular opinion to acquit this man or convict that one.

Thus we commit this case, with all its issues, to your decision, and may the good Father of us all give you the light to see and the grace to discharge your duty.

NOTE. The jury returned a verdict of not guilty.

The indictment in the above case was framed upon section 5440 of the Revised Statutes, and is as follows:

### The Indictment.

"United States of America, Eastern District of Missouri, ss: In the District Court of the United States, for the Eastern District of Missouri. At the November Term of said Court, A. D. 1875. The grand jurors of the United States of America duly impanelled, sworn, and charged to inquire in and for the eastern district of Missouri, on their oaths present that Orville E. Babcock and John A. Joyce, late of said district, on the first day of January, in the year of our Lord one thousand eight hundred and seventy-four, at the said district, did conspire, combine, confederate, and agree together among themselves, and with John McDonald, Joseph M. Fitzroy, Alfred Bevis, Edward B. Fraser, Rudolph W. Ulrici, Louis Teuscher, John Busby, Gordon B. Bingham, and John W. Bingham, with certain other persons, to the grand jurors aforesaid unknown, to defraud the United States of the internal revenue tax of seventy cents, then and there imposed by law upon each and every proof gallon of a large quantity, to-wit, one million proof gallons of distilled spirits, thereafter to be produced at certain distilleries, then

and there situated in the city of St. Louis, within said district, to-wit, the distillery then and there occupied by the said Alfred Bevis and Edward B. Fraser, and then and there situated at the northeast corner of Barton street and DeKalb street, in said city of St. Louis, and within said district; the distillery then and there occupied by the said Rudolph W. Ulrici, and then and there situated at the southwest corner of Cedar street and Maine street in the said city of St. Louis, and within said district; the distillery then and there occupied by the said Louis Teuscher, and then and there situated at Nos. 2808, 2810, 2812, 2814, and 2816, inclusive, North Second street, in said city of St. Louis, and in said district; the distillery then and there occupied by the said John Busby, and then and there situated at the southwest corner of Cass avenue and Eleventh street, in said city of St. Louis and within said district; the distillery then and there occupied by said Gordon B. Bingham and John W. Bingham, and then and there situated at No. 1313 Papin street, in said city of St. Louis, and within said district. That afterward, to-wit, on the fifteenth day of July, in the year of our Lord one thousand eight hundred and seventy-four, and at the eastern district of Missouri, the said Alfred Bevis and Edward B. Fraser, in pursuance of, and in order to effect, the object of said conspiracy, combination, confederacy, and agreement, so had as aforesaid, did remove from the said distillery situated as aforesaid at the northeast corner of Barton street and DeKalb street, in the said city of St. Louis, to a place other than the distillery warehouse situated upon and constituting a part of the distillery premises, to-wit, to a place to the jurors aforesaid unknown, a large quantity of spirits, to-wit, ten thousand proof gallons thereof, upon which said spirits the internal revenue tax of seventy cents, then and there imposed by law upon each and every proof gallon thereof, had not been first paid, and thereby did then and there defraud the United States of said tax. That afterward, to-wit, on the said fifteenth day of July, in the year of our Lord one thousand eight hundred and seventy-four, and at the said eastern district of Missouri, the said Rudolph W. Ulrici, in pursuance of, and in order to effect, the object of said conspiracy, combination, confederacy, and agreement, so had as aforesaid, did remove from the said distillery situated as aforesaid at the southwest corner of Cedar street and Main street, in the said city of St. Louis, to a place other than the distillery warehouse, situated upon and constituting a part of the said distillery premises, to-wit, to a place to the jurors aforesaid unknown, a large quantity of spirits, to-wit, ten thousand proof gallons thereof, upon which said spirits the internal revenue tax of seventy cents then and there imposed by law upon each and every proof gallon thereof had not been first paid, and thereby did then and there defraud the United States of said tax. That afterward, to-wit, on the said fifteenth day of July, in the year of our Lord one thousand eight hundred and seventy-four, and at the said eastern district of Missouri, the said Louis Teuscher, in pursuance of, and in order to effect, the object of said conspiracy, combination, confederacy, and agreement, so had as aforesaid, did remove from the said distillery, situated as aforesaid at Nos. 2808, 2810, 2812, 2814, and 2816, inclusive, North Second street, in the said city of St. Louis, to a place other than a distillery warehouse, situated upon and constituting a part of the said distillery premises, to-wit, to a place to the jurors aforesaid unknown, a large quantity of spirits, to-wit, ten thousand proof gallons thereof, upon which said spirits the internal revenue tax of seventy cents, then and there imposed by law upon each and every proof gallon thereof, had not been first paid, and thereby did then and there defraud the United States of said tax. That afterward, to-wit, on the said fifteenth day of July, in the year of our Lord one thousand eight hundred and seventy-four, and at

the said eastern district of Missouri, the said John Busby, in pursuance of, and in order to effect, the object of said conspiracy, combination, confederacy, and agreement, so had as aforesaid, did remove from the said distillery, situated as aforesaid at the southwest corner of Cass avenue and Eleventh street, in the said city of St. Louis, to a place other than the distillery warehouse situated upon and constituting a part of the said distillery premises, to wit, to a place to the jurors aforesaid unknown, a large quantity of spirits, to-wit, ten thousand proof gallons thereof, upon which said spirits the internal revenue tax of seventy cents, then and there imposed by law upon each and every proof gallon thereof, had not been first paid, and thereby did then and there defraud the United States of said tax. That afterward, to-wit, on the said fifteenth day of July, in the year of our Lord one thousand eight hundred and seventy-four, and at the said eastern district of Missouri, the said Gordon B. Bingham and John W. Bingham, in pursuance of, and in order to effect, the object of said conspiracy, combination, confederacy and agreement, so had as aforesaid, did remove from the said distillery situated as aforesaid at No. 1313 Papin street, in the said city of St. Louis, to a place other than the distillery warehouse, situated upon and constituting a part of the said distillery premises, to-wit, ten thousand proof gallons thereof, upon which said spirits the internal revenue tax of seventy cents, then and there imposed by law upon each and every proof gallon thereof, had not been first paid, and thereby did then and there defraud the United States of said tax. That afterward, to-wit, on the first day of February, in the year of our Lord one thousand eight hundred and seventy-four, and at the said eastern district of Missouri, the said John A. Joyce, in pursuance of, and in order to effect, the object of said conspiracy, combination, confederacy, and agreement, so had as aforesaid, did aid and abet in the removal from the said distillery of Alfred Bevis and Edward B. Fraser, to a place to the jurors aforesaid unknown, of a large quantity of distilled spirits, to-wit, one thousand proof gallons thereof, upon each and every proof gallon of which said spirits the internal revenue tax of seventy cents, then and there imposed by law, had not first been paid, contrary to the form of the statute of the United States in such cases made and provided, and against their peace and dignity. David P. Dyer, United States Attorney for the Eastern District of Missouri."