Ex parte BLACK et al.

(District Court, E. D. Wisconsin. July 27, 1906.)

1. CRIMINAL LAW—FEDERAL PRISONERS—REMOVAL—PROSECUTION—PROBABLE CAUSE.

On an application for the removal of a federal prisoner from the district where he is found to the district of the indictment, as authorized by Rev. St. § 1014 [U. S. Comp. St. 1901, p. 716], it is the duty of the removing judge to pass judicially on the validity of the indictment, and, if that is fatally defective, to deny the application for removal.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, §§ 509, 510.]

2. CONSPIRACY—INDICTMENT—OVERT ACT.

An overt act must be alleged in an indictment for conspiracy as an essential element of that offense.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Conspiracy, § 89.]

3. SAME.

Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], declares that if two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all of the parties to the conspiracy shall be liable to a penalty, etc. *Held*, that where a conspiracy contemplated fraudulent entries on definite tracts of public land under the stone and timber act, and in order to accomplish the same the co-operation of 16 persons to act as entrymen was required, and one of the conspirators obtained such persons, an alleged overt act charged to consist of the payment of $200 to defendant, who was one of the 16, in order to induce him to make a fraudulent entry and transfer of the lands to the conspirators, was an act which pertained to the conspiracy itself, and was therefore insufficient.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Conspiracy, §§ 38, 39.]

**4.** SAME.

Where the overt act alleged as a part of a conspiracy to defraud the United States took place after the conspiracy had been consummated, it was ineffective as an overt act to constitute such offense.

**5.** CRIMINAL LAW—CONSPIRACY—LIMITATIONS—COMMENCEMENT OF PERIOD.

Where an alleged conspiracy to defraud the United States out of public lands was formed in September, 1902, and the necessary affidavits to consummate the fraud were filed on the 7th and 8th of October, 1902, the filing of such affidavits constituted an overt act, which started limitations against a prosecution for conspiracy, which was barred on October 8, 1905, under Rev. St. § 1044 [U. S. Comp. St. 1901, p. 725], limiting prosecutions for federal offenses to three years after the offense shall have been committed.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, §§ 273, 275.]

Writ of habeas corpus accompanied by a writ of certiorari to the commissioner.

It appears: That the defendants were arrested upon a warrant issued upon the complaint of Edward J. Henning, Assistant United States Attorney for the Eastern district of Wisconsin, in which there was set out in substance the cause of action counted upon in a certain indictment against the defendants, who reside in Shawano in this district, which indictment was found in the district of Oregon on the 3d day of April, 1906, charging a conspiracy under section 5440, Rev. St. [U. S. Comp. St. 1901, p. 3676], to defraud the government of its title to certain of its public lands situate in Lakeview land district, of Oregon, which were subject to entry under the "Stone and Timber Act," so-called. That a bench warrant had been issued upon such indictment and, with a certified copy thereof, forwarded to the authorities of the Eastern district of Wisconsin. Thereupon the accused were arrested and brought before a commissioner for examination under section 1014, Rev. St. [U. S. Comp. St. 1901, p. 716], for the purpose of procuring an order for the removal of the accused to the district of Oregon. Upon such proceedings a certified copy of the indictment was introduced in evidence. In this indictment, and in the complaint of the District Attorney, the conspiracy was laid as follows: "And the grand jury aforesaid, upon their oath, do further find and present that from and on the 1st day of September, 1902, and thence down to and inclusive of the 20th day of June, 1903, within the district and state of Oregon and the jurisdiction of this court, the defendants [naming them] and others to this grand jury unknown, did knowingly, willfully, and unlawfully plot, combine, confederate, and agree together, with each other and between and amongst themselves, to defraud the United States of America of the possession and use of and title to large tracts of public lands which were then and there owned by and belonging to the United States, in the district and state of Oregon, and in the Lakeview land district thereof, and within the jurisdiction of this court, designated and described as follows: [Here follow twelve descriptions of lands.] That said lands were during said period in said Lakeview land district, subject to entry under that certain act of the Congress of the United States known and designated as the 'Stone and Timber Act' relating to and governing the entry of timber and stone claims under the laws of the United States. That said act is known and designated as Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545] and that the aforesaid plot, conspiracy, combination, confederation, and agreement so formed and continued by them [naming the defendants] and others to this grand jury unknown, was to be carried out, accomplished, and effectuated by promising and agreeing to pay, and by paying and causing to be paid, large sums of money to sundry and divers persons, who were thereby induced, caused, procured, and persuaded to make false, fraudulent, fictitious, feigned, untrue, and illegal entries of, to, for and upon the aforesaid lands of the said United States within said land district, and within the jurisdiction of this honorable court."

147 F.—53

The overt act in the first count is set out in the following language: "And that to carry out and accomplish the object and design of the aforesaid plot, conspiracy, combination, confederation, and agreement, and in furtherance thereof, and to effectuate the objects thereof, they [said defendants] and others to this grand jury unknown, did, within the United States and the district and state of Oregon, and within the jurisdiction of this court, promise and agree, and did pay and cause to be paid to one John B. Million, the sum of $200 on the 4th day of April, 1903, by Joseph Black above-named [he being one of the defendants] in the shape and form of a check in words and figures as follows: 'Ashland, Oregon, April 4, 1903. No. —— Bank of Ashland, Pay to John B. Million or order ($200.00) Two Hundred Dollars. Jos. Black.' And that said John B. Million indorsed said check and presented said check to said Bank of Ashland, within the state of Oregon, with his indorsement thereon, and there and then received the amount thereof, to wit, the sum of $200 in gold coin of the United States, whereby, and by means whereof, said John B. Million was persuaded, caused, procured, and induced to make false, fraudulent, fictitious, feigned, untrue, and illegal application for, and to make false, fraudulent, fictitious, untrue, and illegal final proof and entry under the aforesaid timber and stone act of and for a portion of the above-described lands of the United States, to wit [one of the above descriptions] which said application, proof, and entry were there and then made by said Joseph B. Million, for the use, benefit, and behoof of the said [defendants] and for the use, benefit, and behoof of each of them; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

In three additional counts, the conspiracy as laid in the first count is adopted, and the overt acts charged are substantially the same, except as to the name and date. The date of payment in the second count is laid on the 23d day of May, 1903, in the third count on the 20th day of April, 1903, and in the fourth count on the 13th day of June, 1903. Upon the examination the commissioner received oral evidence of sundry residents of Shawano, tending to show that the accused had not been absent from their homes for any length of time during the period covered by the indictment, to anticipate any claim that they were fugitives from justice, and also the testimony of several witnesses, whose attendance had been secured by the government, tending to show that all the lands described in the first count of the indictment were entered in October, 1902, and that, as to all such descriptions, the final proofs were made on or before the 17th day of March, 1903; and that on the same day that the final proofs were completed, the necessary money payments made to the government, certificates issued, and thereupon the entrymen transferred their title to said land, presumably to the defendants, but they testified that they were not able to tell who was the grantee in such deeds. Parker, one of the defendants, who resides in Oregon, was also present, and gave evidence that on behalf of all the defendants he secured 16 persons to act as entrymen, who, in consideration of their services in bringing about the fraudulent entries, were to receive $200 each, and that all their expenses were to be paid by defendants, and that after final certificates were secured at the land office, they were to transfer the title so secured. That defendant Parker selected the 16 entrymen and secured adherence to such terms, and that he transported such 16 entrymen in a body from place to place in conveyance furnished and paid for by the defendants, whenever any step was required to be taken in prosecution of the scheme. It further appeared that the several sums of money paid by the defendants as set forth in the indictment, to the parties for their services in furtherance of the conspiracy were paid "for making the final entry, final proofs, and conveying, and that such entry, final proofs, and conveyance, were made with the understanding that such sum of money agreed upon, was to be received for such entry, final proof and conveyance."

Parker's testimony corroborated the witnesses of the government as to dates when entry and final proofs were made. The defendants offered in

evidence before such commissioner a certified copy of certain entries in the tract book in the office of the General Land Office at Washington, which was duly authenticated, showing the status of all the lands described in the indictment, showing amongst other things the date of sale of each tract; the number of the receipt and certificates of purchase, the name of the purchaser, the amount paid, etc. This offer was excluded by the commissioner. The offer was renewed upon this hearing and was received. From this official record, it appears that each and every description of such land was entered in October, 1902, and final proofs were made therein in March, 1903, the latest certificate bearing date March 17, 1903. This index consisted of the following columns: "Description of Tract," "Contents," "Rate per Acre," "Purchase Money," "Name of Purchaser," "Date of Sale," "No. of Receipt," and "Certificate of Purchase." Under the head of "Date of Sale," the latest entry opposite any of these tracts was March 17, 1903. By stipulation of the parties the motion of the government to remove the prisoners to the district of Oregon, pursuant to section 1014, was presented and argued in connection with the habeas corpus proceedings.

Ryan, Ogden & Bottum, M. J. Wallrich and A. S. Larson, for petitioners.

H. K. Butterfield, U. S. Atty., and E. J. Henning, Asst. U. S. Atty.

QUARLES, District Judge. It is conceded by counsel on both sides, that in passing upon the motion to remove the prisoners, the District Judge is called upon to exercise a judicial function involving judicial discretion; but it is strenuously contended that as to any defects disclosed in this indictment, the trial court in Oregon has exclusive jurisdiction. In view of the grave consequences involved to the accused, I am persuaded that something more is expected of the District Judge in this case than a mere perfunctory sanction of the conclusions of the commissioner as to probable cause.

The law is well settled by Judge Seaman, in Re Richter (D. C.) 100 Fed. 295, as follows:

"The questions whether the inquiry before the commissioner extends beyond the introduction of the indictment and the identity of the defendant, and whether there is sufficient proof of identity, are not jurisdictional, for determination under the writ of habeas corpus, and, on the other hand, their solution is not required to determine whether a warrant of removal should issue. I have no doubt of the authority of the District Judge, on the latter application, to probe the grounds of the charge, and ascertain the existence of probable cause; and the duty is manifest to do so in his case before entering an order to send the defendant to distant Alaska for trial." United States v. Fowkes, 3 U. S. App. 247, 53 Fed. 13, 3 C. C. A. 394; Price v. McCarty, 89 Fed. 84, 32 C. C. A. 162; In re Burkhardt (D. C.) 33 Fed. 25.

"Undoubtedly the indictment is presumptive of probable cause, if an offense within the statute is clearly stated, and in that view, may be accepted in many cases as sufficient; but it is not conclusive, and, if so treated for all purposes of the examination, the just provisions in that behalf are of no practical value. In the application for removal, at least, if doubt is raised in any material aspect of the charge, the indictment must be supported by proof aliunde, and in the present case necessary ingredients to constitute the offense are so placed in doubt that no removal can be ordered without such proof."

In re Buell, 3 Dill. 116, 120, Fed. Cas. No. 2,102, the court says:

"The District Judge in making this order, proceeded upon the ground that he might properly look into the indictment, and if it was fatally defective in

essential averments to constitute an offense triable in the District of Columbia, he might refuse to issue the warrant for the prisoner's removal. It is argued that the question of the sufficiency of the indictment is for the court in which it was found, and not for the District Judge on such an application. I cannot agree to this proposition in the breadth claimed for it in the present case. This provision devolves on a high judicial officer of the government a useful and important duty. In a country of such vast extent as ours, it is no light matter to arrest a supposed offender, and, on the mere order of an inferior magistrate, remove him hundreds, it may be thousands, of miles for trial. The law wisely requires the previous sanction of the District Judge to such removal."

In re Beverly Clark, 2 Ben. 543, Fed. Cas. No. 2,797; In re Wolf (D. C.) 27 Fed. 600; In re Corning (D. C.) 51 Fed. 205.

In Benson v. Henkel, 198 U. S. 2, 25 Sup. Ct. 569, 49 L. Ed. 919, where, by a divided court, it was held that as a general rule technical objections to the indictment should not be entertained by the commissioner in proceedings for removal under section 1014, it is apparent that the majority opinion lays down no fast and hard rule, for on page 10 of 198 U. S., page 570 of 25 Sup. Ct. (49 L. Ed. 919), they recognize and enumerate many defects which would destroy the effect of the indictment as a ground for removal. United States v. Greene (D. C.) 100 Fed. 941; In re Dana (D. C.) 68 Fed. 893, 899; In re Price (C. C.) 83 Fed. 830, affirmed in 32 C. C. A. 162, 89 Fed. 84; In re Greene (C. C.) 52 Fed. 106.

In Beavers v. Henkel, 194 U. S. 87, 24 Sup. Ct. 605, 48 L. Ed. 882, the court hold that:

"So far as respects technical objections the sufficiency of the indictment is to be determined by the court in which it was found, and is not a matter of inquiry in removal proceedings."

From all the authorities the rule would seem to be that the indictment makes out a prima facie case as to probable cause; that technical objections to the indictment ought not to be entertained by the commissioner in proceedings under section 1014; that however the rule may be in habeas corpus proceedings when the judge is asked to make an order of removal, it is his province and duty to discharge the accused if the indictment is so radically defective that it would not support a conviction; as, for instance, where it clearly appeared that no crime against the United States is charged. It is interesting to note that the District Court of Oregon has also concurred in this view. In re Wood (D. C.) 95 Fed. 288–290.

The Supreme Court has been loth to impose rigid restrictions upon the judges called upon to act under section 1014. They have preferred to leave it to the sound discretion of the judge to distinguish between mere technical irregularities and fatal defects in the indictment. Section 5440, under which this indictment is found, reads as follows:

"If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years or to both fine and imprisonment in the discretion of the court."

If this indictment fails to allege any overt act, it is as worthless as so much waste paper (U. S. v. Watson [D. C.] 17 Fed. 145; U. S. v. Reichert [C. C.] 32 Fed. 144; Bannon v. U. S., 156 U. S. 465, 15 Sup. Ct. 467, 39 L. Ed. 494), and the accused are illegally restrained. It is a singular feature in this case that all the essential facts bearing upon the contested propositions of law are undisputed. The indictment must be read in the light of the facts. When so construed, this indictment breaks down. First, because the subject-matter of the alleged overt act appertains to the conspiracy; second, because the alleged overt act took place after the conspiracy had been consummated; third, because the action is absolutely barred by the statute of limitations. It must be borne in mind at the outset that Congress introduced a radical change in the law of conspiracy when it incorporated section 5440 into the statute. At the common law a conspiracy was ripe when the secret agreement had been reached by and among the conspirators. Under the statute, the unlawful agreement still constitutes the crime, as it did before.

In United States v. Britton, 108 U. S. 204, 2 Sup. Ct. 534, 27 L. Ed. 698, the court say:

"This offense does not consist of both the conspiracy and the acts done to effect the objects of the conspiracy, but of the conspiracy alone."

The policy of Congress was, not to introduce a new element into the crime, but to allow a period of grace, an opportunity for repentance, after the plot had been perfected, and before any decisive act had been done in furtherance of it. Therefore, the courts are required to differentiate sharply between the agreement per se and acts in furtherance of the agreement. Generally, a conspiracy, such as that charged here, must have its formative stage, its period of organization, its preparatory steps and preliminary arrangements, which may consume considerable time before the parties are ready to begin actual open operations. During all such time, and until some act has been done to effect the purpose—some overt act—the parties may abandon the conspiracy and be held guiltless of the offense. Dealy v. United States, 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545; Hyde v. Shine, 199 U. S. 76, 25 Sup. Ct. 760, 50 L. Ed. 90. It has been sometimes held that the date of the overt act ought to be set out, so that the court can see that it postdates the conspiracy, and that it is not a part of it. United States v. Milner (C. C.) 36 Fed. 890.

Let us apply these legal principles to the case at bar, keeping in mind the duty of distinguishing between the conspiracy and the open acts done in furtherance thereof. This conspiracy contemplated fraudulent entries of certain definite tracts of land under the stone and timber act. It appears by the evidence that the accused went to Oregon, where they associated with them one Parker, also named as defendant in the indictment. In order to accomplish their unlawful purpose they needed the active co-operation of 16 persons to act as entrymen. It was agreed that Parker should secure these men to assist and co-operate in the scheme. Parker secures the 16 persons, explains the scheme to them. They assent to the same, and agree to do each his part of what is required by the law to make a complete

entry, including false affidavits, etc., and further agree to turn over the title to all such lands after acquiring the same. The defendants, through Parker, agree to pay each of these parties $200, and to defray all their expenses. This compact was made in September or early in October, 1902. When the time was ripe, these 16 entrymen were assembled by Parker, and, at the expense of· defendants, transported in a body to the place where the initial affidavits were to be filed, and on the 7th and 8th days of October, 1902, these 16 affidavits were made and filed, and thus the first open step was taken to carry out the purposes of the conspiracy. And so, step by step, these 16 entrymen, under the immediate guidance of Parker, carried out the plot in all its details, and after receiving final certificates, transferred and surrendered the fruits of the conspiracy.

Now the practical question is whether, under such circumstances, the pleader is at liberty to adopt as an overt act the bargaining with the entrymen and the payment to them of the agreed stipend. Enough has appeared to brand the entrymen as co-conspirators. They were not innocent tools in the hands of the defendants to do some ministerial act, but, under the personal guidance of Parker, the working out of the scheme in its entirety and in all its details was turned over to them. It is familiar that if a series of acts is to be performed with a view to produce a particular result, he who aids in the performance· of any one of these acts in order to bring about the result, knowing what the object is, must have the intention to effectuate the end proposed, and if he operates with others knowing them to have the same design, there is in fact an agreement between him and them. His criminal intent is not to be distinguished from the intent of those who first formed the plan of the conspiracy. 2 Archibald's Crim. Pl. & Pr. 1054; United States v. Cassidy (D. C.) 67 Fed. 702; United States v. Babcock, 3 Dill. 581, Fed. Cas. No. 14,487. It matters not how subordinate the service they render. United States v. Stevens (D. C.) 44 Fed. 132–140. It makes no difference in the application of this rule whether the co-conspirators are indicted or not. United States v. Cassidy (D. C.) 67 Fed. 703. Suppose they had been joined as defendants, as they might have been, and the indictment had outlined the entire conspiracy, the bargaining with the entrymen and the payment to secure their adherence would have been an essential part of the plot, really an enlargement of the conspiracy, and not partaking of the nature of an overt act. ⸴ A payment of $500 in advance to defendant was so treated in United States v. Babcock, 3 Dill. 581, Fed. Cas. No. 14,487. The agreement of the 16 entrymen to cooperate was an essential part of the combination underlying this crime. The bargaining with them was an integral part of the secret plot. Thus far everything rested in agreement, and was relevant to the conspiracy.

A simple illustration may make the position more evident. Suppose that Parker had not only bargained with the entrymen, but had actually paid them their stipend in advance, in consideration of their agreement, and ·at that point the scheme had been abandoned and no steps had ever been taken looking to the actual entry of any land,

would the crime have been complete? Could any one of the tentative acts relating to the secret plot have been adopted as an overt act? If so, section 5440 is a mere rhetorical flourish. The fact that the payment was delayed does not change the essential character of the act. It has not escaped my attention that the overt act in this indictment is framed in imitation of the indictment in Dealy v. United States, 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545. It is not averred in that case, and does not appear, that the defendant Allen, who induced and persuaded the entrymen, ever disclosed the fact that behind him was a combination to rob the government. The entrymen acting under individual persuasion may have been ignorant, and is presumed to have been innocent of the criminal conspiracy. In that event the persuasion on the part of Allen would have no connection with the conspiracy as such, but would be purely an executive act on his part, calculated to effect the common purpose, and, therefore, a competent overt act. The distinction is apparent to every lawyer between a mere outsider, who is hired by one member of the conspiracy to do an act, and the case of an accomplice, who, understanding the illicit scheme, proceeds to assist in its execution. The court in that case had in mind the very distinction that we are insisting upon, because they say on page 546 of 152 U. S., page 683 of 14 Sup. Ct. (38 L. Ed. 545): "The solicitation was not a part of the conspiracy, but subsequent to and in furtherance of it. No such conclusion would be warranted under the facts of this case. This indictment has industriously obscured the distinction between section 5440 and the common law. It has ignored all the overt acts incident to the fraudulent entry of these lands, and has seized upon an act which relates back to the conspiracy as and for the only overt act. The payment of the several entrymen must be distinguished from an open act in furtherance of the common purpose, because it is connected therewith only through the initial agreement; otherwise it has no relevance to the alleged crime. The stone and timber act under which these entries were made, itself prescribes the several steps which must be taken to effect the object of this conspiracy. For some reason, which may appear later on, all these have been ignored by the pleader, and an ingenious effort has been made to substitute an equivocal act which belongs to the formative stage of the conspiracy. To give effect to the statute, and to enforce the wise and gracious policy of Congress, which recognizes an interval known as the locus penitentiæ, between the conspiracy and the overt act, we are constrained to hold that the indictment is in this regard radically defective."

Second. The undisputed evidence shows that before the 3d day of April, 1903, the date of the earliest alleged overt act, the conspiracy laid in the indictment had been consummated. There is a strange confusion in the averments of the indictment as to dates and the sequence of events, whereby, upon the face of the indictment, it would appear that by the payment of $200 to John B. Million, one of the entrymen, on the 4th day of April, 1903, he was induced and persuaded to make certain false and fraudulent entries which were "then and there made," etc. The witnesses for the government, and the

tract book of the Land Office, show beyond dispute that each and every of these preliminary entries was made on the 7th and 8th of October, 1902. So that these entrymen must have been "persuaded and induced" to undertake this scheme before that date. In like manner it is conceded by the government that the final proofs were made as to each and every of these tracts of land, the consideration thereof paid to the government, final certificates issued, and a conveyance taken from each of the entrymen, on or before the 17th day of March, 1903. Thereby everything was accomplished which was contemplated by the conspiracy, as laid in the indictment. Every step had been taken and had been ratified and approved by the officers of the Land Office, and a transfer secured of the fraudulent titles so acquired. The only overt acts to support the indictment are certain payments made to the entrymen between the 4th day of April and the 13th day of June, 1903, to carry out the agreement made in the preceding September when they joined the conspiracy.

An overt act presupposes a pending conspiracy. So that the act of any one done in furtherance of the conspiracy, may bind all of his associates. When a conspiracy has been completely effected, this implied agency disappears. Logan v. United States, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429; Brown v. United States, 150 U S. 93, 14 Sup. Ct. 37, 37 L. Ed. 1010. It is a contradiction of terms to speak of an act done to effect the purpose of the conspiracy after the conspiracy has been accomplished. Such an anomalous doctrine might prolong a conspiracy, and would keep it in active operation until every obligation incurred during the formative period of the plot had been liquidated. In United States v. Donau, 11 Blatchf. 168, Fed. Cas. No. 14,983, the function of an overt act is declared to be "to show that the unlawful combination became a living active combination." I believe no case can be found where the overt act postdated the consummation of the conspiracy. Where would be the locus penitentiæ in such a case? So that, whether you consider the subjectmatter of the alleged overt act or its date, weeks after the conspiracy had been completed, the indictment discloses a desperate effort on the part of the pleader to confuse the distinction of the law, and to resuscitate a cause of action which, presumably, through the neglect of some one, has been allowed to lapse.

Third. It is apparent from the evidence that the cause of action set out in the indictment is barred by the statute of limitations. By section 1044, Rev. St. [U. S. Comp. St. 1901, p. 725], Congress has declared:

"No person shall be prosecuted, tried or punished for any offense * * * unless the indictment is found * * * within three years next after such offense shall have been committed."

Judge Bunn, in United States v. McCord (D. C.) 72 Fed. 159, says:

"I have no doubt that the statute of limitations has stood in the way of this prosecution from the first, and that counsel for the government have felt the difficulty."

This language seems to fit the case at bar, and to explain some eccentricities of the pleader. When was this offense committed, and

when did the three years begin to run? The indictment avers that the conspiracy was formed in September, 1902, to bring about the fraudulent entry of certain lands therein described. The filing of the necessary affidavits on the 7th and 8th of October, 1902, must have set the statute running, because it was an open act on the part of the defendants to effect the purpose of the conspiracy. Therefore, according to the general precepts of the law, the action would be barred on the 8th day of October, 1905. The indictment in this case was found on the 3d day of April, 1906. To escape this dilemma the pleader has been driven to skillful fencing and adroit expedients.

It is contended on the part of the government that this was a so-called continuing crime. Conceding for the purposes of the argument that a conspiracy may, under certain circumstances, be recognized as a continuing crime; what fact or feature is there here to bring this case within such a classification? Here the conspiracy was confined to a single undertaking, limited to particular descriptions of land, and completed within six months. The entrymen were handled like a drilled squad, and transported from place to place, taking the several necessary steps which culminated, on the 17th day of March, 1903. No effort was made to enlarge the original conspiracy to embrace any other lands, or adapt it to any further or different transaction. In the Greene-Gaynor Case, United States v. Greene (D. C.) 115 Fed. 349; Greene v. Henkel, 183 U. S. 251, 22 Sup. Ct. 218, 46 L. Ed. 177, the conspiracy was formed in 1891. From year to year the old conspiracy was adapted to new contracts, whereby the government was defrauded; and in 1897 it was revived as to certain new government contracts. There might be some reason for treating that as a continuing offense, which was revived afresh with each new contract. But there is no well-reasoned case to which my attention has been called which justifies the doctrine that in every case of conspiracy the statute begins to run from the last overt act instead of the first. In cases of that nature the doctrine of Commonwealth v. Bartilson, 85 Pa. 482, and Insurance Company v. State, 75 Miss. 24, 22 South. 99, is the more sane and reasonable. If the illicit scheme is continued and new overt acts to carry it out occur within the period of limitation, the pleader should charge a new conspiracy, and the jury may be warranted from all the evidence in finding the existence of such new offense within that period. This appears to have been the course adopted in United States v. Greene (D. C.) 115 Fed. 349. The indictment charged a conspiracy in 1891 and another in 1897, notwithstanding what is said in the opening about a continuing crime. Certain it is that on the 8th day of October, 1902, a definite overt act was performed, and on the 9th day of October, 1902, an indictment, charging the conspiracy might have been found. Certainly the statute began to run at that date. What circumstance has intervened in this case to interrupt it? The law in such case has been well laid down by Judge Bunn of the Western District of Wisconsin, in United States v. McCord, supra:

"They (counsel for the government) admit that the indictments may properly have been found in March, 1891; that the conspiracy to defraud the

government was then formed by the defendants, and various acts performed intended to effectuate its objects. If this be so, it is difficult to see why the statute did not then begin to run. Otherwise, you would have a different period of limitation in conspiracies from what you have in other offenses against the government, which could not have been the intention of the law. * * * Counsel no doubt anticipated this difficulty, and sought to avoid it by alleging an overt act committed on October 23, 1891, so as to avoid the claim of the running of the statute. Now to make good this contention, it is claimed that a conspiracy is a continuing offense. No doubt a conspiracy is a continuing offense in this sense: that whenever an individual comes into the conspiracy, however late, he is considered as adopting all the previous acts of his co-conspirators, and is liable in the same degree with them. But that it is a continuing offense in the sense that, as to the first and original parties to the conspiracy, this statute begins to run anew from the time of the commission of every overt act, is a contention that the court is unable to affirm."

The same doctrine was announced in the district of Oregon in United States v. Owen (D. C.) 32 Fed. 534, which was a case of the same nature as this, where the court says:

"But, admitting this is a continuous crime, the demurrer must be sustained on this point. That being the case, the prosecution of the defendants for any act committed three years before the finding of the indictment is barred by lapse of time, and those alleged to have been committed within three years of such finding are not sufficient to constitute the crime defined by the statute. The very foundation of the crime, the conspiracy, is shut out, and, without this circumstance, the offense in question is not charged in the indictment. However, this is an instantaneous crime, composed of the conspiracy, and the first act done to effect the object thereof at whatever distance of time therefrom. When the conspiracy is formed the crime is begun, and when the act is committed it is consummated. An indictment will then lie against the criminal, and the limitation on the right of the government to prosecute him begins to run, and in three years the bar is complete."

This decision accurately defines the situation here. On the 3d day of April, 1906, when the indictment was found, the conspiracy alleged to have been formed on the 1st day of September, 1902, was barred, and we have a naked overt act, without any living active conspiracy to support it. It was said upon the argument that in certain cases not yet reported, the District Court of Oregon has adopted a different rule from that laid down in the Owen Case. Such opinions were not brought to the attention of the court, and I doubt whether they overturn the reasoning of the Owen Case.

Ordinarily, a case like this under the statute of limitations would involve a conflict of evidence, in which case the prisoners should be removed so that the issue might be disposed of in the trial court. But as we have seen, the case at bar involves no conflict, and the court in the interest of the liberty of the citizen, feels constrained to intervene and discharge the prisoners; and it is so ordered.